* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer on the dates of plaintiff's alleged injuries.
3. Defendant-carrier The Hartford (hereinafter "Hartford") was the carrier on the risk until December 31, 2001. Defendant-carrier Liberty Mutual Insurance Company (hereinafter "Liberty Mutual") has been the carrier on the risk at all relevant times thereafter.
4. Defendant-employer and Hartford have accepted compensability for plaintiff's bilateral carpal tunnel syndrome with an injury date of November 2, 1997 in I.C. File No. 881490, and have paid total disability benefits and provided medical care as a result of the injury.
5. Plaintiff's average weekly wage for her accepted injury date of November 2, 1997 in I.C. File No. 881490, is $341.60 per week, which results in a compensation rate of $227.75.
6. Plaintiff's average weekly wage for her alleged injury date of November 5, 2000 in I.C. File No. 166965, is $554.73 per week, which results in a compensation rate of $365.84.
7. Plaintiff's average weekly wage for her alleged injury date of April 1, 2003 in I.C. File No. 342045, is $614.72 per week, which results in a compensation rate of $409.83.
8. The issues before the Full Commission are whether plaintiff sustained an aggravation of her pre-existing compensable bilateral carpal tunnel syndrome on November 5, 2000 and/or April 1, 2003; whether as a result of her employment with defendant-employer plaintiff suffers from an occupational disease to her shoulders and arms with an injury date of April 1, 2003; and whether plaintiff is entitled to any additional workers' compensation benefits under the North Carolina Workers' Compensation Act.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 51 years old at the time of the Deputy Commissioner's hearing. Plaintiff was hired part-time by defendant-employer in November 1990 and began full-time employment in 1995. Plaintiff is not a federal employee and is under the jurisdiction of the North Carolina Industrial Commission.
2. Plaintiff's first job with defendant-employer was in the check processing department, where she received checks in large mailbags and performed "block" encoding of check bundles. Plaintiff put checks into plastic trays and buggies, and the checks were processed through high-speed sorters. Plaintiff routinely took checks from the bags and put them on the trays. If there were more than 16 bundles, plaintiff manually typed information concerning the bundles. She used her hands to handle and encode the checks.
3. Plaintiff received medical treatment for hand problems in the early 1990s. In 1997, however, plaintiff's hand problems increased and she was restricted from blocking checks, although she continued to perform her other job duties. Plaintiff performed some dispatch work, put bundles of checks into bags, ran the low-speed and high-speed sorters, and was expected to reach above the sorter. Plaintiff noticed her hands were sometimes numb and tingled when she performed her job duties. She also experienced shooting pains in her shoulders while running the high-speed sorter. Plaintiff's job duties in the check processing department required frequent, repetitive use of both her hands and shoulders, and she developed compensable bilateral carpal tunnel syndrome with an initial injury date of November 2, 1997. This claim was accepted by Hartford on a Form 21 (I.C. File No. 881490).
4. In 1997, plaintiff received temporary relief from cortisone injections administered by Dr. David Baker of Charlotte Orthopaedic Specialists. In late 1997, however, plaintiff underwent bilateral carpal tunnel releases and was absent from work for 10 to 12 days post-operatively. Plaintiff was released to work with restrictions, and in the summer of 1998 she was released to full-duty work. Upon returning to work, plaintiff continued to operate the low-speed sorter, where checks were processed if they were not encoded. Plaintiff also operated the high-speed sorter and returns. These machines required keying similar to a 10 key adding machine.
5. Plaintiff continued to experience pain in her hands. In July 1999, plaintiff saw Dr. John Gaul, who ordered an EMG and MRI. The studies showed no evidence of compression, but did evidence mild bilateral carpal tunnel syndrome. Dr. Gaul initially elected to treat plaintiff conservatively, performing a cortisone injection.
6. In November 2000, plaintiff experienced recurring pain in her hands and left shoulder, which caused insomnia. These conditions were originally denied by Hartford on a Form 61 (I.C. File No. 166965). After issuance of the Deputy Commissioner's Opinion and Award, Hartford paid all compensation and plaintiff received benefits while she was out of work. Dr. Gaul felt left carpal tunnel surgery and hand therapy was needed. Plaintiff also began to describe problems in the left shoulder, which Dr. Gaul felt represented an impingement syndrome. On November 7, 2000, Dr. Gaul performed a second left carpal tunnel release. Plaintiff was out of work until December 2000, when she was released to return to work four hours per day.
7. Dr. Gaul initially believed plaintiff's shoulder complaints were related to her carpal tunnel syndrome. However, when her complaints failed to resolve following the carpal tunnel release performed in November 2000, Dr. Gaul felt that plaintiff had bursitis and/or arthrosis.
8. Plaintiff returned to work following her carpal tunnel release. At the end of 2002, plaintiff was moved to the adjustments department where she performed additional duties, including writing. When plaintiff changed job duties, she noticed an increase in her symptoms.
9. In 2002, plaintiff was required to do overhead lifting in the adjustments department when she performed filing activities. When performing returns, plaintiff worked with metal "bread racks." Plaintiff pulled checks out of tightly packed boxes that were stored on the bread racks, and had to take the entire box down to manipulate the checks. Plaintiff noticed that her hands hurt after performing these job duties over an extended period of time. The bread racks had 8 to 12 shelves and were approximately six feet tall. Plaintiff stands 5 feet 8 inches tall and had access to a stool to reach the racks. To fill the bread racks, plaintiff had to raise her hands over her head to reach the top shelf. Plaintiff experienced pain when reaching up and if she had to reach up on an extended basis, her shoulder began to hurt. Plaintiff was given work restrictions of no keying more than 15 minutes every hour.
10. In October 2002, Dr. Robert McBride began treating plaintiff on referral from Dr. Gaul. Plaintiff presented to Dr. McBride with a history of worsening left shoulder pain, beginning in November 2000. Plaintiff filed a claim in I.C. File No. 342045 for the recurrence of her shoulder and hand problems. Despite conservative treatment with Dr. McBride, plaintiff ultimately required arthroscopic surgery on her left shoulder on April 4, 2003. At that time, Dr. McBride observed and corrected a partially torn rotator cuff and biceps tendon, and he indicated that plaintiff had bone rubbing into her rotator cuff. Plaintiff was taken out of work and received short-term disability, which was entirely employer funded. At his deposition, Dr. McBride testified and the Commission finds that after January 2002, plaintiff's work proximately augmented her shoulder condition.
11. Plaintiff returned to work in July 2003 as a researcher in the adjustments department. As a researcher, plaintiff was required to key all day, and occasionally pull items from other areas. While working in the adjustments department, plaintiff was expected to sit in front of a computer 85% of the workday and use a keyboard. Plaintiff's condition became worse in July 2003, and she continued to have problems with her left shoulder and both hands.
12. In April 2004, Dr. Gaul performed a right carpal tunnel release. He took plaintiff out of work due to the surgery, but subsequently released her to return to work with restrictions of no frequent lifting greater than five pounds and no keyboarding more than 15 minutes per hour. On July 6, 2004, Dr. Gaul assigned plaintiff a 12% permanent partial disability rating to each hand as a result of her bilateral carpal tunnel syndrome.
13. Dr. Gaul confirmed that plaintiff's complaints regarding both of her hands and her left shoulder continued to increase in 2002 and 2003. He testified that plaintiff exhibited a difference in her physical examination with respect to her shoulder between February 11 and March 5, 2002; specifically, plaintiff demonstrated increased crepitance, or popping, in the shoulder, which Dr. Gaul felt was related to arthrosis and/or arthritis. Dr. Gaul testified and the Commission finds that after January 2002, plaintiff's compensable hand and shoulder conditions were proximately augmented by her work for defendant-employer.
14. Plaintiff's complaints regarding her shoulder have not abated. As of July 20, 2004, plaintiff was still complaining of significant left shoulder pain. Dr. McBride felt plaintiff could work, but he assigned plaintiff work restrictions of no overhead work or lifting above her shoulder. However, as of the date of the Deputy Commissioner's hearing, plaintiff had not yet been released to return to work and thus, had no opportunity to present evidence regarding any reasonable job search for suitable work within her restrictions.
15. Plaintiff last worked for defendant-employer on April 6, 2004 and has not performed any work since then. Plaintiff first became disabled as a result of increased problems with her hands and shoulders on April 4, 2003, when she had left shoulder surgery.
16. Plaintiff returned to work with restrictions following her accepted November 2, 1997 workers' compensation claim for bilateral carpal tunnel syndrome. Even though plaintiff continued to have problems associated with her initial claim, she was able to continue to work until she was taken out of work on April 4, 2003 for left shoulder surgery. At that time, both of plaintiff's treating physicians noted that her condition continued to worsen as a direct result of her job with defendant-employer.
17. Plaintiff was last injuriously exposed to the hazards of her employment while working for defendant-employer after January 1, 2002 when Liberty Mutual was the carrier on the risk.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's initial occupational disease claim for bilateral carpal tunnel syndrome with an injury date of November 2, 1997 was accepted by defendant-employer and Hartford. N.C. Gen. Stat. § 97-53(13).
2. For her additional claims, plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease under N.C. Gen. Stat. §97-53(13). This requires the plaintiff to show that (1) the disease is characteristic of a trade or occupation; (2) the disease is not an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101 (1981).
3. Plaintiff's employment with defendant-employer caused or significantly contributed to the development and/or aggravation of her bilateral carpal tunnel syndrome and shoulder condition, and plaintiff's job with defendant-employer placed her at an increased risk for developing these conditions. Plaintiff's carpal tunnel syndrome and shoulder conditions are not ordinary diseases of life to which the general public is equally exposed and, therefore, plaintiff contracted compensable occupational diseases. N.C. Gen. Stat. § 97-53(13); Booker v. MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979).
4. As a result of her compensable occupational diseases, plaintiff was disabled and is entitled to temporary total disability compensation at the rate of $365.84 per week for any and all periods of disability beginning November 7, 2000 through December 31, 2001, to be paid by Hartford. N.C. Gen. Stat. §97-29.
5. After January 1, 2002, Liberty Mutual was the carrier on the risk in that plaintiff was last injuriously exposed to the hazards of her employment with defendant-employer after January 1, 2002. N.C. Gen. Stat. § 97-57. Therefore, Liberty Mutual is responsible for any workers' compensation benefits plaintiff is entitled to receive after that date and shall reimburse Hartford for any workers' compensation benefits paid by Hartford to plaintiff after January 1, 2002. N.C. Gen. Stat. § 97-29.
6. As a result of her compensable occupational diseases, plaintiff is entitled to temporary total disability compensation at the rate of $365.84 per week for any periods of disability beginning January 1, 2002 through March 31, 2003 and at the rate of $409.83 per week for any periods of disability from April 1, 2003 through July 20, 2004, to be paid by Liberty Mutual. N.C. Gen. Stat. § 97-29.
7. As the result of her compensable occupational diseases, plaintiff sustained a 12% permanent functional impairment to each hand. N.C. Gen. Stat. § 97-31(12).
8. In order to meet the burden of proving continuing disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). In this case, after the Deputy Commissioner's hearing, plaintiff was released to return to work on July 20, 2004, at which time she was capable of some work with restrictions. Plaintiff had no opportunity to present evidence that she was unsuccessful in her search for employment, despite a reasonable effort. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
9. Plaintiff is entitled to have defendants pay all medical expenses incurred or to be incurred as a result of her compensable injury, so long as such evaluations, treatments and examinations are reasonably required to effect a cure, give relief or lessen plaintiff's period of disability. Liberty Mutual shall pay for all medical expenses that arose after January 1, 2002. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, Hartford shall pay plaintiff compensation at the rate of $365.84 per week for any and all periods of disability beginning November 7, 2000 through December 31, 2001, subject to a credit for workers' compensation or employer funded short-term disability benefits already paid to plaintiff, provided there are no reimbursement requirements associated with the short-term disability plan.
2. Subject to the attorney's fee awarded below, Liberty Mutual shall pay plaintiff compensation at the rate of $365.84 per week for any periods of disability beginning January 1, 2002 through March 31, 2003, and at the rate of $409.83 per week for any periods of disability from April 1, 2003 through July 20, 2004. All accrued benefits shall be paid in a lump sum, subject to a credit for employer funded short-term or long-term benefits already paid to plaintiff, provided there are no reimbursement requirements associated with said plans. Because there is no evidence in the record as to plaintiff's continuing disability, the issue of plaintiff's disability, if any, after July 20, 2004 is reserved for future determination.
3. Liberty Mutual shall reimburse Hartford for any workers' compensation benefits paid by Hartford to plaintiff after January 1, 2002.
4. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury, so long as such evaluations, treatments and examinations are reasonably required to effect a cure, give relief or lessen plaintiff's period of disability. Liberty Mutual shall pay for all of these benefits that arose after January 1, 2002.
5. An attorney's fee in the amount of 25% of the compensation awarded is approved for plaintiff's counsel. This fee shall be deducted from the compensation awarded to plaintiff and paid directly to counsel for plaintiff.
6. In the event that the portion of this Opinion and Award that finds Liberty Mutual the carrier on the risk is appealed to the North Carolina Court of Appeals, Liberty Mutual is ordered pursuant to N.C. Gen. Stat. § 97-86.1 to comply with all portions of this Opinion and Award. Liberty Mutual shall be reimbursed by Hartford if Hartford is ultimately held liable.
7. Defendants shall pay the costs of this action.
This 23 day of June, 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER